LAND, Justice.
 

 On May 28, 1924, John Sangassan, by act before E. M. Stafford, notary, transferred to Mrs. Martha Sangassan Doell, his daughter, six pieces of real estate.
 

 On the same day before the same notary, his wife, Mrs. Augustine Lavigne Sangassan, transferred two other pieces of real estate to Mrs. Doell, her daughter.
 

 During his lifetime Mr. Sangassan also caused certain homestead stocks to be transferred from his name to that of Mrs. Doell.
 

 Mrs. Sangassan died July 25, 1932, and Mr. Sangassan died November 23,1933.
 

 Mrs. Doell caused her father’s succession to be opened, qualified as executrix, and took an inventory showing practically no assets.
 

 Decedents left as their sole heirs three children: The defendant, Mrs. Doell; Jules F. Sangassan and M. John Sangassan, the present plaintiffs.
 

 This is an action by the two brothers, as forced heirs, against their sister, to have the sales of the real estate and the transfers of the homestead stock to her declared to be simulations and pretended sales, without any .consideration or delivery, and null and void and of no effect against petitioners, and to
 
 *34
 
 have the property affected thereby recognized as still belonging respectively to the successions of their deceased father and mother, in order that plaintiffs could receive their légitirne.
 

 In the alternative, should the court find that the sales and transfers were made for a consideration, plaintiffs aver that the consideration was far below the actual value of the property affected, and ask that the court force defendant to collate the extra advantage thus sought indirectly to be bestowed upon Mrs. Doell by her parents.
 

 Interrogatories were annexed to plaintiffs’ petition. In her answers to the interrogatories and in her answer to the suit, defendant alleges that the real estate transfers were bona fide sales, that the consideration was as recited in the two acts, and was the fair value of the properties covered.
 

 Defendant denies that possession of the properties was retained by her father and mother, and further denies that any homestead stocks were transferred to her by her father during his lifetime.
 

 The lower court rendered judgment holding both of the notarial acts to be ■ simulations, without consideration of any kind, null, void, and of no effect, and recognizing the properties covered by these acts (with the exception of certain ones transferred to third persons prior to the'present suit) as remaining and being the property of the successions of John Sangassan and Augustine Davigne Sangassan, his wife.
 

 The judgment further recognizes that John Sangassan transferred to defendant forty-four shares of stock of the Eureka Homestead Association and thirty shares of stock of the Reliance Homestead Association; declares these transfers to be simulations without any consideration, null, void, and of no effect; and orders defendant to return the stock in kind to the succession of her father, or to pay his succession the value of same, which was fixed by the court in the sum of $2,067.
 

 As plaintiffs’ principal demand was allowed in full, the lower court did not have to pass on the alternative plea.
 

 Erom this judgment defendant has appealed.
 

 1. On the trial of the case, Mrs. Doell was called as a witness under cross-examination under Act No. 126 of 1908. Defendant’s counsel objected on the ground that she had fully answered the interrogatories, and no exception had been made, and that defendant could not be examined again. The objection was overruled, and properly so, in our opinion.'
 

 Defendant being plaintiffs’ “opponent,” we know of no good reason why she should not have been cross-examined under the act.
 

 Besides, plaintiffs are the forced heirs of decedents, and are seeking in this suit to set aside as simulations, without consideration, null, void, and of no effect, certain acts of their ancestors, and this may be done
 
 by parol evidence.
 

 Article 2239 of the Revised Civil Code, as amended by Act No. 5 of 1884, provides that: “Counter letters can have no effect against creditors or
 
 bona fide
 
 purchasers; they are valid as to all others;
 
 but forced heirs
 
 shall have the same right to annul absolutely
 
 and by parol evidence
 
 the simulated contracts
 
 *36
 
 of those from whom they inherit, and shall not be restricted to the legitimate.” (Italics ours.)
 

 “In other words, a forced heir may attack
 
 by parol
 
 a transfer made by his ancestor, for the purpose of showing that it was a simulation, in order to bring the property back into his ancestor’s succession or to recover it for himself. * * * ” (Italics ours.) Eberle v. Eberle, 161 La. 313, at page 318, 108 So. 549, 551.
 

 “The main contention, in the court below, on this point, it would appear from the judge’s opinion, was that
 
 parol evidence
 
 was not admissible to prove the simulated character of the acts by which the defendant Joseph T. Mulhaupt became vested with the record title,
 
 ami that the plaintiffs were bound by the answers to the interrogatories on facts and articles.
 
 However, as to all of the other heirs, with the possible exception of Rinaldo A. Phelps, such testimony, in our opinion, was clearly admissible under the provisions of Act No. 5 of 1884, amending article 2239 of the Revised Civil Code. * * *
 

 “So that, in an action of the kind now before us,
 
 forced heirs
 
 are not held within the restrictions imposed by article 2275 of the Civil Code as to the propounding of interrogatories on facts and articles concerning real property, but may introduce any other
 
 parol proof
 
 to make out their ease.” (Italics ours.) Phelps v. Mulhaupt, 146 La. 1078, at page .1084, 84 So. 362, 364.
 

 2. On the day of the trial, the defendant filed an exception of no cause of action based upon the fact that
 
 plaintiffs
 
 had annexed to their petition numerous interrogatories which were answered by defendant, and that, in answering such interrogatories, defendant precluded the use of parol-evidence to prove that the transfers in question were simulations, without consideration, null, and void.
 

 This exception was also put in the form of an objection to parol testimony when defendant was put on the stand by plaintiffs, under the provisions of Act No. 126 of 1908.
 

 In our opinion, both the exception and objection to the testimony were properly overruled for the reasons already assigned above.
 

 3. On May 28, 1924, Mrs. Augustine Lavigne Sangassan sold to. defendant, her daughter, two pieces of real estate in the city of New Orleans for the consideration of $10,000.
 

 The deed recites that defendant paid $2,000 cash, and gave her note for the balance of $8,000, payable one year after date, with 8 per cent, interest from date.
 

 On the same day, May 28, 1924, John Sangassan sold to defendant, his daughter, six pieces of real estate in the city of New; Orleans for the consideration of $14,000.
 

 The deed recites that defendant paid $4,000 cash, and gave her -note for the balance of $10,000, payable one year after date, with 8 per cent, interest from date.
 

 The record shows that it was highly improbable that defendant could have had as large a sum of money in her possession as $6,000 on May 28, 1924, the date of both of the sales. Up until the time of the transfers defendant was living with her father and mother in their house. She had never worked or earned any money and had no means. De
 
 *38
 
 fendant testifies that this money came from savings and investments and an inheritance from her husband, who had died some seven years before.
 

 Defendant’s statement that her husband left her a considerable sum of money is not borne out by the facts and circumstances of the case. He was working for Stevens Clothing Store as a petty cashier and bundle wrapper at a salary of $12 to $15 a week. His succession was never opened. He kept no bank account or bank box, and the substantial sums he is supposed to have left were stated by defendant to be in cash and Liberty bonds. Defendant testifies that these bonds were sold by her through her broker, as she needed the money to buy property or pay notes; but she failed .to produce the broker to corroborate her testimony.
 

 Defendant. also asserts that her husband left large amounts of life insurance; but she did not name one of the companies in which the supposed policies were taken out, or prove the actual existence or amount of these policies.
 

 The statement by defendant that a large estate was left her in cash, Liberty bonds, and life insurance by her husband, a man in extremely moderate conditions, is improbable upon its face, and requires strong substantiation by testimony other than the mere statements of defendant.
 

 On May 28, 1924, the date of these two sales of real estate to defendant, both Mr. and Mrs. Sangassan had bank accounts in the City Branch of the Whitney Bank. Neither of these accounts shows any deposits on or about May 28, 1924, to correspond with the sums of $2,000 and $4,000 cash which, defendant claims, were paid her father and mother, when these acts of sale were passed. Nor were the witnesses to these acts produced to prove any such payment by defendant.
 

 Defendant’s statement that she kept large sums of money at home in all sorts of places from a dresser to a shoe are not verified by a single witness.
 

 Defendant’s note for $8,000 was canceled in May, 1926. At the time the note was canceled, one of the properties covered by it was sold to a third person for $6,750.
 

 Defendant testified that she took the cash from this sale home and used it as she needed it.
 

 Defendant’s note for $10,000 was canceled in July, 1927. At that time one of the properties covered by it was sold for $9,620.
 

 As a matter of fact, the proceeds of both of these sales were paid direct to Mr. Sangassan and were deposited to his bank account after deduction of agent’s commission and expenses.
 

 Defendant testifies that she paid the interest on these notes in cash and the payments were indorsed on the notes. The two notes themselves show not a single indorsement of any interest payment. Nor does Mr. Sangassan’s bank account show any receipts which might in any way correspond with the interest on these notes.
 

 There was no change in the management of these properties after the sales to defendant on May 28. 1924.
 

 Mr. Sangassan continued to rent same by written leases in his name as lessor. He fixed
 
 *40
 
 the rents, and rent notes went to his credit in his account at the Whitney Bank. Defendant, as late as 1933, even assisted her father in making out rent receipts in his name.
 

 There was no change made in the fire insurance policies after May 28, 1921.
 

 The properties remained covered in the names of Mr. and Mrs. Sangassan, respectively. In fact, all of the properties are still so insured, with the exception of the one on Nerón place, which was changed to the name of Mrs. Doell, defendant in 1932, eight years after the sale and shortly after Mrs. Sangassan’s death.
 

 The Langbehn Insurance Company dealt with Mr. Sangassan during his lifetime as owner of these properties. All bills for insurance were rendered in his name. He fixed the amount of insurance to be carried on the various properties, and used to pay the bills himself.
 

 In December, 1932, one of these properties was slightly damaged by fire. On January 27, 1933, a proof of loss covering the damage was-presented to the insurance company. The proof of loss was made out in the name of Mr. Sangassan, as owner, and defendant, on cross-examination, admitted that she signed her father’s name to it.
 

 In 1931 repair work was done on most of the properties. Mr. Sangassan was the one with whom the cost was discussed and fixed, and who paid the bills.
 

 Prom all of these facts and circumstances, it is obvious that the sales of real property made to defendant by her father and mother were simulations, without consideration, and are null and void and of no effect.
 

 4. The facts as to the transfer of the homestead stocks by Mr. Sangassan to defendant, his daughter, are as follows:
 

 On July 22, 1924, Mr. Sangassan transferred to defendant ten shares of stock of the Reliance Homestead, $100 par, and twenty-four shares of the Eureka Homestead, $50 par.
 

 Mr. Sangassan’s bank account does not show any deposit about that date of any sums equivalent to the value of the stocks.
 

 On July 25, 1927, these same blocks of stock were retransferred by defendant.to Mr. Sangassan. On that date he also bought twenty more shares of Reliance Homestead stock and twenty more shares of Eureka Homestead stock. He held these stocks for four or five years. On September 13, 1932, he transferred to defendant the forty-four shares of the Eureka Homestead stock, and on January 17, 1933, the thirty shares of the Reliance Homestead stock.
 

 The market value of the stocks on these, respective dates was: Eureka Homestead $42.-50 per $50 share; and Reliance Homestead, $32 per $100 share.
 

 The dividend checks on. the Eureka Homestead stock, during the entire period, even when the stock was in defendant’s name, were indorsed by her and given to her father, John Sangassan, who, in turn, indorsed same, and either cashed them at his bank, the City Branch of.the Whitney Bank, or deposited them in his account.
 

 All of this stock was sold by defendant immediately after the present suit was brought.
 

 There are no deposits shown in Mr. Sangassan’s bank account to correspond with the
 
 *42
 
 alleged purchases by defendant in September, 1932, and January, 1933.
 

 The only explanation of defendant as to how she acquired this stock is her uncorroborated statement that she bought it from her ■ father through a broker, who was not produced to verify her statement.
 

 From these facts and circumstances, it is clear that John Sangassan was the true owner of, and controlled, the stocks at all times and got the dividends on same, and that there was no reality to these transactions back and forth between the father and daughter.
 

 It is plain from the record that, in the middle of 1924, Mr. Sangassan conceived the idea of putting all property standing in his and his wife’s name in his daughter’s name.
 

 The reason for this is apparent, and is given by defendant herself in her testimony: Mr. Sangassán had signed “so many things” for his sons that he was afraid of losing his properties.
 

 Plaintiff’s testimony, page 17, is as follows:
 

 “Q. Wanted to get the properties off his hands?
 

 “A. Because he was afraid of- losing it on account of his sons. He had signed so many things for his sons that he saw the day he would lose money, so he would rather sell it and take cash. * * *
 

 “Q. That was the principal reason for the transfer at the time?
 

 “A. That was the principal reason.”
 

 About this same time, Mr. and Mrs. Sangassan transferred to defendant, their daughter, all of the real estate, some eight pieces, $2,000 worth of Reliance Homestead stock, and $1,-200 worth of Eureka Homestead stock. Mrs. Sangassan closed out her savings account in the Whitney Bank, and transferred the balance of $3,825 to an account in the name of her daughter, although jointly controlled by her and Mr. Sangassan, and Mr. Sangassan closed out his savings account.
 

 We find no error in the judgment of the lower court.
 

 Judgment affirmed.